[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF APPEAL
The plaintiffs, John Meadows, Patricia Meadows, and Frank Meadows,[1] appeal from the decision of the defendant, the Middlefield Zoning Board of Appeals. The Zoning Board of Appeals upheld and modified a cease and desist order issued by the Zoning Enforcement Officer.
 BACKGROUND
On March 13, 1996, one of the plaintiffs, John Meadows, filed an application to construct a 2400 square foot building addition on a parcel located at 205 Main Street in Rockfall, Connecticut (Return of Record [ROR], Exh. A). The parcel contains 5.35 acres and is located in a residential zone. (ROR, Exh. 5). The application was accompanied by several sketches of the proposed construction. (ROR, Exh. A). Meadows also submitted an application for a special permit, dated March 13, 1996, describing "assembly and storage" as the proposed structure/use.[2] (ROR, Exh. V, Attachment). Subsequently, the CT Page 12292 Zoning Enforcement Officer (ZEO), Mark Lundgren, referred Meadows to the Planning and Zoning Commission (Commission), to obtain the appropriate review. (ROR, 4/22/97 Transcript [Tr.], pp. 9-10.
On April 24, 1996, the Commission approved the addition, noting that "the proposed addition to the existing building will not increase or intensify the non-conforming use and is, therefore, approved with the notations on the map limiting the area for outside storage along with the restrictive use for the designated Building B on the sketch and the planting of a buffer area to the northerly border." (ROR, Exh. E, p. 2; Exh. F; Exh. N).
During construction, Lundgren inspected the property several times. (ROR, Exh. 5). By letter dated February 4, 1997, however, Tim Grady, an abutting neighbor, sought a cease and desist order on the basis that a second floor had been constructed. (ROR, Exh. 5). On February 27, 1997, Lundgren issued a cease and desist order, declaring that Meadows had "constructed a building substantially larger than Building Permit no. 3.13.96.14 allows. This is a violation of Zoning Regulation 8.02.01 which states `Except as provided herein, a non-conforming use shall not be enlarged or extended.'" (ROR, Exh. 1, Attachment). The order further stated that "Please Note: This order was voted on at the February 26, 1997 Planning and Zoning Commission meeting." (ROR, Exh. 1, Attachment).
On March 21, 1997, the Meadows appealed the cease and desist order to the Zoning Board of Appeals (ZBA). (ROR, Exh. 1). The ZBA conducted hearings over several nights, and, on July 22, 1997, it voted to uphold the order with certain modifications. (ROR, Exh. 5). The ZBA observed that the Commission's original approval had been for a single floor, consisting of 2400 square feet, but the current structure contained 4800 square feet and two floors. (ROR, Exh. 5). The ZBA noted that because the structure was to be used for nonconforming uses, the zoning regulations required that any additional square footage should have been approved by the Commission. (ROR, Exh. 5). It emphasized that the regulations vested authority in the Commission, not the ZEO, to "approve any enlargement, extension, construction, reconstruction, move or structural alteration of a structure with a non-conforming use." (ROR, Exh. 5). The ZBA also noted that it was unknown whether the conditions for approval had been met. (ROR, Exh. 5). The ZBA further determined that "[u]nder the regulations, the ZEO could not approve the construction of a 2nd floor under these circumstances and the ZEO did not approve CT Page 12293 the 2nd floor for any type of use, whether non-conforming or conforming." (ROR, Exh. 5).
The Meadows now appeal from the ZBA's decision to the Superior Court.
 JURISDICTION
General Statutes § 8-8 governs appeals taken from the decisions of a zoning board of appeals to the superior court. "A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created." (Internal quotation marks omitted.) BridgeportBowl-O-Rama v. Zoning Board of Appeals, 195 Conn. 276, 283,487 A.2d 559 (1985).
Aggrievement "[P]leading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of a plaintiff's appeal." (Emphasis added.) Jolly, Inc. v. ZoningBoard of Appeals, 237 Conn. 184, 192, 676 A.2d 831 (1996). The Meadows allege they own land in Middlefield known as 205 Main Street. (Complaint, ¶ 1). They further allege that they own land which abuts, or which is within a 100-foot radius of, the land involved in the ZBA's decision, and that the ZBA's decision affects property which they own. (Complaint, ¶ 7(a), (b)).
An owner of the subject property is aggrieved and entitled to bring an appeal. Winchester Woods Associates v. Planning ZoningCommission, 219 Conn. 303, 308, 592 A.2d 953 (1991). In addition, General Statutes § 8-8(a)(1) provides that "`aggrieved person'" includes a person owning land abutting or within a radius of 100 feet "of any portion of the land involved in the decision of the board."
The Meadows have alleged aggrievement and the record contains a copy of a deed by which Florence Meadows conveyed four certain parcels of property, with buildings and improvements thereon, to Frank Meadows and/or Johnny L. Meadows, Jr. (ROR, Plaintiff's Exh. A; Exh. 1, Attachment). At the August 6, 1998 trial in this matter, the plaintiff, John Meadows, testified as to his ownership of the subject parcel, and a deed was offered into evidence. Accordingly, the Court has determined that Meadows is aggrieved. CT Page 12294
Timeliness and Service of Process
General Statutes 8-8(b) provides, in pertinent part, that an "appeal shall be commenced by service of process in accordance with subsections (e) and (f) of this section within fifteen days from the date that notice of the decision was published as required by the general statutes."
Subsection (e) further provides that service "shall be made by leaving a true and attested copy of the process with, or at the usual place of abode of, the chairman or clerk of the board, and by leaving a true and attested copy with the clerk of the municipality."
The Meadows allege that the ZBA published notice of its decision in the Middletown Press on July 26, 1997; (Complaint, ¶ 6); and this is substantiated by a notation made on the copy of the Notice of Decision contained in the record. (ROR, Exh. 3). On August 7, 1997, this appeal was commenced by service of process on the Assistant Town Clerk of Middlefield and upon the Chairman of the Middlefield Zoning Board of Appeals. (Sheriff's Return.)
The Court finds that this appeal was commenced in a timely fashion by service of process upon the proper parties.
 SCOPE OF REVIEW
A zoning board hears and decides an appeal from the decision of a zoning enforcement officer "de novo." Caserta v. ZoningBoard of Appeals, 226 Conn. 80, 88-89, 626 A.2d 744 (1993). "It is the board's responsibility, pursuant to the statutorily required hearing, to find the facts and to apply the pertinent zoning regulations to those facts." Id., 90. "In doing so, the board is endowed with a liberal discretion." (Internal quotation marks omitted.) Id. "It follows from the de novo nature of the board's consideration of the issues decided by the zoning enforcement officer that the trial court, upon a judicial appeal from the board pursuant to General Statutes § 8-8, must focus on the decision of the board and the record before it, because it is that decision and record that are the subject of the appeal under § 8-8." Id., 90-91.
"Where a zoning agency has stated its reasons for its CT Page 12295 actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the consideration's which the authority was required to apply under the zoning regulations." (Internal quotation marks omitted.) Caserta v. Zoning Board of Appeals,supra, 226 Conn. 86-87. "Under this traditional and long-standing scope of review, the proper focus of a reviewing court is on the decision of the zoning agency, and, with regard to its factual determinations, on the evidence before it that supports, rather than contradicts, its decision." Id., 87.
 DISCUSSION
As previously stated, the ZBA upheld Lundgren's issuance of the cease and desist order with certain modifications. (ROR, Exh. 5). Specifically, the ZBA determined that Meadows must cease and desist from constructing the second floor, or using it for any purpose, and that the existing second floor, and any access thereto, must be rendered unusable. (ROR, Exh. 5). The ZBA, however, permitted the Meadows to use the first floor if the conditions contained in the original Commission approval were met, an application was filed with the Commission for approval of the second floor use, and the second floor remained unusable. If the Commission denied the application, or approval was not received within five months, then the second floor was to be removed. (ROR, Exh. 5).
The Meadows appeal on the grounds that the ZBA is estopped from denying them the right to use the improvements as constructed, for the purposes for which they were constructed, and that the ZBA exceeded its authority, acting illegally and arbitrarily, by ordering the existing second floor, and any access to it, to be rendered unusable or removed. (Complaint, ¶ 8(a), (b)). They further appeal on the grounds that the ZBA erred in concluding that the constructed improvements were not approved, and that the ZBA exceeded its authority, and acted illegally and arbitrarily, "in conditioning the right to utilize the first floor upon application to the [Commission] by the plaintiffs and upon the second floor remaining unusable . . ." (Complaint, § 8(c), (d)).
I. Whether the ZBA is Estopped from Denying the Meadows the Right to Use the Improvements as Constructed
The Meadows observe that the zoning enforcement officer, CT Page 12296 Lundgren, "delivered" a building permit to them, following his review of "detailed building plans," which modified the sketch originally shown to the Commission, and that Lundgren informed Meadows that he need not return to the Commission to review said plans. (Plaintiffs' Brief).[3] The Meadows maintain that, in reliance upon Lundgren's actions, they constructed a 60' x 40' two-story building "at substantial effort and expense." (Plaintiffs' Brief). They further contend that Lundgren erroneously allowed the building to be constructed. The Meadows argue that Lundgren had visited the subject premises on many occasions during the construction, had observed the second floor, discussed renting part of the building for his own use, and failed to raise the issue of the second floor violating the zoning regulations "until the construction was substantially completed in February of 1997." (Plaintiffs' Brief).
The ZBA maintains that the Meadows previously argued their estoppel theory before the board, and it has the authority to weigh the credibility of witnesses. The ZBA contends, however, that the Meadows did not persuade it that Lundgren misled them into believing that they could construct a second story, nor did the ZBA find that Lundgren would have had such authority under the regulations to grant such approval. The ZBA contends, therefore, that the Meadows have not met the initial prong of estoppel, i.e., that a party having authority in such matters induces another party to believe that certain facts exist. It maintains that the Meadows were unable to persuade it that they "were induced to believe that they had permission from the ZEO for the second story to be built," or "that anyone other than the Planning and Zoning Commission could grant such approval." (Defendant's Memorandum of Law, p. 8).
"The courts have consistently held that the general rule applicable to the invocation of the doctrine of estoppel against municipal corporations should be limited and invoked (1) only with great caution, (2) only when the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the zoning or building regulations." (Emphasis in original.) Dupuis v. Submarine BaseCredit Union, Inc., 170 Conn. 344, 354, 365 A.2d 1093 (1976). "[E]stoppel always requires proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other CT Page 12297 party must change its position in reliance on those facts, thereby incurring some injury." (Internal quotation marks omitted.) Dornfried v. October Twenty-Four, Inc., 230 Conn. 622,634-35, 646 A.2d 772 (1994). "Moreover, it is the burden of the person claiming the estoppel to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge." Dupuis v. Submarine Base CreditUnion, Inc., supra, 170 Conn. 353.
In the present case, during the public hearing of June 3, 1997, the Meadows' attorney, Edward Lang, raised the issue of estoppel before the ZBA. (ROR, 6/3/97 Tr., pp. 21-23. Lang, citing generally to Connecticut case law, explained that when an individual approaches a town official, and the official issues a permit for something that is otherwise not permitted "[a]nd the person then goes out and constructs the building in accordance with the permit . . . that's been issued to them, and . . . the building [is] substantially completed, and then the Town steps in and says, oh, no, we shouldn't have given you that permit, or said yes, we saw you building it, but we didn't want to stop you. But now we want to stop you and not let you use it. And if that person has already gone through the expense of building that building, and there is no significant benefit to the community of making them tear down the building, Connecticut Courts have said in that case the Town [is] estopped from requiring that person to take down what otherwise should not have been permitted." (ROR, 6/3/97 Tr., pp. 21-22.[4]
The ZBA's July 22, 1997 decision noted that the Commission had approved the Meadows' single story, 2400 square foot addition, and had found that, "based upon the approval and its conditions, no expansion of a non-conforming use resulted." (ROR, Exh. 5). The ZBA further observed that "[a]fter conferring with the Commission, the ZEO issued a cease and desist order dated February 27, 1997, which order was appealed by the [Meadows] and which order is the subject of this appeal to the Board." (ROR, Ex. 5). The ZBA emphasized that, although the Commission's approval "was for a 1 floor building consisting of 2,400 square feet," the present building "currently has 4,800 square feet with 2 floors." (ROR, Exh. 5). It determined, therefore, that any additional square footage should have been approved by the Commission pursuant to 08.02.04 of the regulations because the "[s]tructure was to be used for non-conforming uses." (ROR, Exh. 5). The ZBA observed that, pursuant to the regulations, only the CT Page 12298 Commission had such approval authority, not the ZEO, and that "[u]nder the [r]egulations, the ZEO could not approve the construction of a 2nd floor under these circumstances and the ZEO did not approve the 2nd floor for any type of use, whether non-conforming or conforming." (ROR, Exh. 5).
At the April 22, 1997 hearing, John ("Jay") Meadows testified that he had informed Lundgren of the existence of an "upstairs" when he initially filled out the permit application. (ROR, 4/22/97 Tr., p. 8). He further testified that he submitted the building plans to the building department on July 22nd or July 23rd of 1996, and shortly thereafter he spoke to Lundgren about obtaining a permit to begin construction. (ROR, 4/22/97 Tr., pp28-29. Meadows claimed that Lundgren had told him that someone had sent Lundgren a note concerning "a full second floor of the building[,]" and Lundgren informed Meadows that "as far as he was concerned the building was fine." (ROR, 4/22/97 Tr., pp. 29-30. Meadows also stated that Lundgren had visited the site more than six times after the second floor had been constructed. (ROR, 4/22/97 Tr., pp. 34). He further claimed that, following the addition of the second floor, Lundgren never informed him that it was impermissible, but during a visit in February, Lundgren admitted to Meadows that "I honestly don't remember the second floor." (ROR, 4/22/97 Tr., p. 35).
During that hearing, however, testimony was offered that contradicted Meadows' testimony. Lundgren, referring to a "drawing" submitted by Meadows that showed stairs, explained "it's the drawing that shows stairs. [Nowhere] in our files did we ever receive a drawing like this that showed stairs." (ROR, 4/22/97 Tr., p. 65). Frank St. John, the Chairman of the Planning and Zoning Commission, also claimed on the record that "[a]t no time during this presentation did Mr. Meadows even hint that there was a second floor. We got a complete dog and pony show, if you would by Mr. Lang. At no time was there any mention by Mr. Lang that there was a second floor to this building." (ROR, 4/22/97 Tr., p. 55). St. John further insisted that "[t]his Commission bought into their approval on the basis that there would be 2400 square feet. And that included [a] first floor, no second floor . . . I can tell you unquestionably that the Planning and Zoning Commission when it made the approval it limited it to 2400 square feet, one story building." (ROR, 4/22/97 Tr., p. 56).
Two other members of the Commission, Edward Tulinski, a certified manufacturing engineer, and Lucy Petrella, also claimed CT Page 12299 that there had been no indication that Meadows intended to construct multiple stories. (ROR, 4/22/97 Tr., pp. 57, 59). Tulinski stated that he attended all the meetings, and he specifically remembered the total allowable footage to be 2400 square feet. (ROR, 4/22/97 Tr., p. 56). He continued, "[i]f there was any indication whatsoever that the structure was to be multiple stories — was not really a condition at the time of the approval." (ROR, 4/22/97 Tr., p. 57). Petrella, who attended two of three meetings, concurred that it was her "clear recollection . . . it was 2400 square feet. We spent a lot of time going over what, you know, to keep that site in conformance and not to have that nonconformance increase and there was never any discussion of a second floor that I am aware of. That's my recollection." (ROR, 4/22/97 Tr., p. 59).
At the May 15, 1997 hearing, Lundgren indicated that he "had a lot of contacts with the Meadows through this process. I had possibly two inspections early on in the process and it appeared to be going correctly at that time." (ROR, 5/15/97 Tr., p. 5). Lundgren further stated that he normally did not perform "inspections until the very end of a project when a certificate of occupancy is looked for." (ROR, 5/15/97 Tr., p. 5). He also claimed that there was no talk of a second floor before the Commission, but that "the whole idea was not how many floors, because that was not in their planning and zoning approval, it was the number of square feet . . . in my mind as long as they did not go over 45 feet in height, which is the regulation, and that they didn't go over 2400 square feet, they could have had any number of floors that the building code would have allowed." (ROR, 5/15/97, p. 5). Lundgren later reiterated "our height regulation limits buildings to 45 feet . . . it was my opinion that he could have as many floors that he wanted, provided twothings happened, the Planning and Zoning approval of 2400 total square feet was maintained, and the height would not exceed 45 feet from ground level." (Emphasis provided.) (ROR, 5/15/97 Tr., p. 49). Attorney Lang then asked Lundgren whether it was "fair to say that you actually told [Meadows] it was okay to have a two story building[,]" and Lundgren replied, "I didn't advise and I don't advise anyone because it is definitely not my business to advise on what kinds of buildings people should build or could build." (ROR, 5/15/97 Tr., p. 49). Later, Lang asked Lundgren when Lundgren realized that the building contained a second floor, and Lundgren responded that it was in late January or early February. (ROR, 5/15/97 Tr., p. 60). Lundgren added that he had received a complaint from Grady, (the abutting neighbor), on CT Page 12300 January 27th, and on February 4, 1997 Lundgren made arrangements to conduct a site visit. (ROR, 5/15/97 Tr., pp. 60-61. Lundgren then reconfirmed that prior to that time he did not realize there was a second floor in this building. (ROR, 5/15/97 Tr., pp. 60-61. Lundgren further testified that at the time of his inspections of the building, in June, there was no problem and that "I believed he was in compliance with his application, his permit . . . I believed that he met his foot print on the sketch that was approved by Planning and Zoning . . . I beIieved that he was building the building that I signed off on the March 13th building permit application." (ROR, Tr., 5/15/97, pp. 64-65.
At the June 3, 1997 hearing, Meadows was asked when he had decided to increase the size of the building. Meadows responded that when he changed the roof style to gambrel, he had gone to Lundgren and Satagaj (a building official). Meadows was then asked whether he had inquired if it was necessary for him to return to the Commission, and Meadows responded "Yes, I did. And at that time he pulled out the minutes of the meeting and said that building size to me, put on the plot plan, at a later date, it was very clear to that, and that's when I proceeded to hire the architect. I never hired him until after the foundation plan was issued to him, and I had a foundation permit in my hand." (ROR, 6/3/97 Tr., pp. 18-19.
The record further contains a May 13, 1997 letter from a building official, A.P. Satagaj, stating that "at no time" had Satagaj written a letter to Lundgren regarding a building at 205/209 Main Street, nor ever "discussed any second floor on any building at this location before his cease and desist order was issued." (ROR, Exh. Y). The record also contains a handwritten document, signed by Satagaj, entitled "Inspections Permits," indicating that on December 23, 1996, he had been called "to make a rough plumbing inspection" at the site, although he did not recall having issued a plumbing permit. (ROR, Exh. R). He further stated that "[a]t this time I also noticed what was to be a second floor and became concerned about its integrity. Mrs. Pat Meadows then came on the site and I informed her of my concern and asked her to have Jay submit plans for the structure before continuing. I was invited to climb a ladder to see what was happening on the 2nd floor, climbing ladders that high is not my forte." (ROR, Exh. R). Based upon the record, the Court finds that the Meadows have not met the prongs of the municipal estoppel doctrine. The record before the ZBA reflects that the CT Page 12301 Meadows had approval to construct a 2400 square foot structure, but that the existing structure contains two floors. Section 02.06.04 of the Middlefield Zoning Regulations defines "floor area" as "[t]he sum of the gross horizontal areas of the severalfloors of a building, measured from the exterior faces of exterior walls . . ." (Emphasis provided.) (ROR, Exh. 4). Therefore, it is submitted that the existing structure now contains 4800 square feet.
Section 10.03 of the regulations, entitled "Enforcement," provides that "[t]hese regulations shall be enforced and administered by the Zoning Commission or their duly appointed agent, in accordance with the provisions of these Regulations." (ROR, Exh. 4).
Section 08.02.04(1) of the regulations further provides "[i]f any existing structure devoted to a use not permitted by these regulations in the zone in which it is located is proposed to be enlarged[,] extended, constructed, reconstructed, moved or structurally altered except in changing the use of the structure to a use permitted in the zone in which it is located, then such enlargement, extension, construction, reconstruction, move or structural alteration shall be approved by the Commission as specified in these regulations." (ROR, Exh. 4). Subsection (2) also states that "[n]o expansion of a non-conforming structure or site shall be permitted except with the approval of the Commission." (ROR, Exh. 4). Subsection (3) enumerates non-conforming, commercial uses that may be expanded, including retail businesses, personal service shops, professional offices, studios, office buildings, public garages, and gas stations. This regulation further provides that any uses not listed may not be expanded pursuant to this section. (ROR, Exh. 4). Subsection (4) continues with "[a]ll expansions of non-conforming use pursuant to this section shall be subject to approval by the Planning and Zoning Commission as a Special Permit . . ." (ROR, Exh. 4).
Citing several Connecticut cases, the Meadows maintain that municipal estoppel has been recognized when the party claiming the doctrine would be subjected to a substantial loss if the municipal agency was permitted to negate the acts of its agent. (Plaintiffs' Brief).
Municipal estoppel may be invoked only when the violation "has been unjustifiably induced by an agent having authority insuch matters . . ." (Emphasis provided.) Dupuis v. SubmarineCT Page 12302Base Credit Union, Inc., supra, 170 Conn. 354. As properly determined by the ZBA in its decision, the Middlefield zoning regulations vest the authority to approve a structure such as the Meadows' in the Commission, not in the ZEO. (ROR, Exh. 4). The ZBA's determination is supported by the evidence in the record. As previously set forth, in a letter dated February 27, 1997, written by Lundgren to Meadows, Lundgren informed Meadows of the cease and desist order, issued only after it had been put to a vote at a February 26, 1997 Planning and Zoning Commission meeting. (ROR, Exh. 1).
As previously discussed, the Meadows also argue that they constructed their building in reliance upon Lundgren's actions. In voting to uphoId the cease and desist order, the ZBA had found that Lundgren had made several inspections of the property during the course of construction. (ROR, Exh. 5). Even if Lundgren had been "an agent having authority in such matters," however, the record before the ZBA contained contradictory evidence with respect to this issue. For example, while Meadows testified that it had been made "very clear" that he need not seek additional approval from the Commission, Lundgren testified that he did not "advise" Meadows with respect to a two story building. The ZBA's decision expressly states that it had "weighed the testimony and evidence" and reviewed the Middlefield zoning regulations in making its findings. (ROR, Exh. 5). "[A] court must defer to the agency's assessment of the credibility of the witnesses . . ." (Internal quotation marks omitted.) Gardiner v. ConservationCommission, 222 Conn. 98, 108, 608 A.2d 672 (1992). "[T]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." (Internal quotation marks omitted.) Conetta v. Zoning Board ofAppeals, 42 Conn. App. 133, 138, 677 A.2d 987 (1996).
II. Whether the ZBA Erred in Concluding that the Constructed Improvements Were Not Approved
The Meadows also contend that the Commission determined that the construction of a 60' x 40' building on the subject site was not an expansion of a nonconforming use, and they argue that the building, as constructed, was the same size as that approved by the Commission. They further maintain that they claimed before the ZBA that the use of the second floor did not constitute an expansion of a nonconforming use, and that the ZBA should have determined the validity of the claim. The Meadows contend that the ZBA erred by deferring this decision to the Commission, and CT Page 12303 that the ZBA also erred in finding that the ZEO could not approve the construction of a second floor.
The ZBA counters that the Commission found there was no expansion of a nonconforming use only after the Commission had placed conditions on the approval, "including an exchange of non-conforming use of square footage, which conditions have not been fully satisfied." (Defendant's Memorandum of Law, p. 8). Therefore, the ZBA claims that the Meadows should have appealed the original approval, rather than mounting a collateral attack on such conditions without exhausting their administrative remedies. The ZBA emphasizes that the Meadows' application sought approval for a 2400 square foot building; instead they constructed a 4800 square foot building.
The Meadows' initial contention, that the building is not larger than the structure permitted by the Commission, is disingenuous. As set forth above, the initial application sought approval for 2400 square feet, and the Commission approved 2400
square feet, but the completed structure contains 4800 square feet.
The Meadows further maintain that the ZBA erred in determining that the ZEO could not approve the construction of a second floor. As previously discussed, however, the regulations (§ 08.02.04), vest authority in the Commission, not the ZEO, to grant approval with respect to construction involving an existing structure "devoted to a use not permitted by these regulations in the zone in which it is located . . ." (ROR, Exh. 4).
III. Whether the ZBA Exceeded its Authority, and Acted Illegally and Arbitrarily, by Ordering the Second Floor to be Rendered Unusable and/or Removed
The ZBA determined that the Meadows must cease and desist "from constructing or using for any purpose the 2nd floor of the Structure on the Property and they shall have the existing 2nd floor and any access thereto rendered unusable as it was not approved, under the Regulations, by the Commission or the ZEO." (ROR, Exh. 5).
The Meadows further argue that the ZBA exceeded its authority by ordering the second floor to be rendered unusable, thereby improperly anticipating a future zoning violation. They argue CT Page 12304 that the only issue before the ZBA should have been the use of the second floor. The Meadows contend that the ZBA determined that the building exterior and size were in conformity with the regulations, and that the Commission ordered the Meadows to cease and desist from using the second floor. They conclude, therefore, that "[a]ny further order concerning denial of access and/or removal of the second floor is illegal and an abuse of discretion." (Plaintiffs' Brief).
The ZBA asserts that it acted within its authority by ordering the Meadows not to use the second floor because it had found that the second floor had never been approved by the Commission. The ZBA emphasizes that it was merely giving the Meadows time to obtain approval before ordering the removal of the illegal second floor.
General Statutes § 8-7 provides, in part, that the ZBA "may reverse or affirm wholly or partly or may modify any order, requirement or decision appealed from and shall make such order, requirement or decision as in its opinion should be made in the premises and shall have all the powers of the officer from whom the appeal has been taken but only in accordance with the provisions of this section."
In an appeal from a decision of a zoning enforcement officer, "[i]t is the board's responsibility, pursuant to the statutorily required hearing, to find the facts and to apply the pertinent zoning regulations to those facts . . . In doing so, the board is endowed with a liberal discretion." (Citations omitted; internal quotation marks omitted.) Caserta v. Zoning Board ofAppeals, supra, 226 Conn. 90. "It would be inconsistent with these broad grants of power to the board . . . to envision the board's function as anything less than a de novo determination of the issue before it, unfettered by deference to the decision of the zoning officer." Id.
In the present case, the ZBA had properly determined that the additional square footage of the second floor should have been approved by the Commission, and the ZBA, in "a de novo determination of the issue before it," modified the cease and desist order to require the Meadows to obtain the appropriate approvals. (ROR, Exh., 5).
A "[b]oard is not required to anticipate that the applicant would later violate the zoning regulations by a use not CT Page 12305 authorized . . . and should such a violation occur, the ready remedy is by proper legal action at that time." (Emphasis provided). Miklus v. Zoning Board of Appeals, 154 Conn. 399, 402,225 A.2d 637 (1967). By ordering the Meadows to render the second floor, and any access thereto, unusable, the ZBA was not anticipating a future violation, but merely modifying, and implementing, the original cease and desist order by addressing the subject matter of the present violation — the existence of an illegal second floor.
IV. Whether the ZBA's Decision is Contrary to the Evidence Before It
Finally, the Meadows contend that the evidence before the ZBA was that the use of the second floor of the building continued to be less than the amount of nonconforming uses that had previously existed. They further contend that the evidence before the ZBA demonstrates that the ZEO "had given prior approval to the construction of the second floor and continued to approve construction throughout the entire period of construction from July of 1996 until February of 1997." (Plaintiffs' Brief).
The ZBA admits that it heard contradictory evidence concerning "much of the factual underpinnings" surrounding this appeal, but, after reviewing the testimony and documentation, it chose to believe the testimony of Lundgren, and the testimony of others that supported the issuance of the cease and desist order. The ZBA emphasizes that the record amply supports its decision.
The evidence before the ZBA does not support the Meadows' contention that "use of the second floor of the building in question" continued to be less than the amount of nonconforming uses which had previously existed.
Meadows testified before the ZBA at the April 22, 1997 hearing with respect to the Commission meeting at which the Commission approved his new building. (ROR, 4/22/97 Tr., pp. 7-20. He stated that he had agreed at that time to give up the use of a "commercial industrial use in the basement of building "`B'" and that he also agreed that "there would be no more outdoor storage" in one of the areas. (ROR, 4/22/97 Tr., pp. 19-20.
Mr. Colegrove, the town planner, testified during the April 22, 1997 ZBA hearing as to the history of the Meadows' site (ROR, 4/22/97 Tr., pp. 38-49. Colegrove stated there had been a coverage reduction on the site, and "the activities have CT Page 12306 obviously changed on the site, but the overall coverage of the site has reduced to the reduction structures." (ROR, 4/22/97 Tr., p. 41). Colegrove admitted that he had no recollection of a second floor and he alluded to a "trade off" in that "[t]he building was 40 by 60 which is 24 inch square feet and that's what basically my memory from the minutes indicates the square footage, to trade off to building "`B'" was 2100 square feet which was less than 24, and there was an additional area that was used for storage that was removed in additional prohibition — and that's basically the trade off. My memory of the — recollection as to what was allowed 24 inch square feet." (ROR, 4/22/97 Tr., p. 49).
The Meadows further argue that the evidence before the ZBA reveals that Lundgren had given initial approval to the construction project, as well as continued approval throughout the entire construction period. This argument merely reiterates the Meadows' estoppel argument. As previously set forth, the record before the ZBA revealed contradictory evidence as to this issue, but the ZBA was at liberty to uphold the cease and desist order based upon its assessment of the credibility of the witnesses and its determination as to the factual issues.
Upon reviewing the ZBA's reasons for upholding the cease and desist order, and after examining the record support for these reasons, the Court concludes that the ZBA's reasons are reasonably supported by the record evidence. The Meadows' appeal is dismissed.
Henry S. Cohn, Judge